BARNEY MACKLEY, ALIAS BARNEY MCGANIGAL. v. THE STATE.

No. 15522.   Delivered February 1, 1933.
Rehearing Denied Without Written Opinion April 19, 1933.
Reported in 59 S. W. (2d) 128.

The opinion states the case.

*Abe W. Wagner, K. C. Haynie,* and *John A. Mobley, Jr.,* all of Houston, for appellant.

*O'Brien Stevens,* District Attorney, and *E. T. Branch,* both of Houston, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, imprisonment in the penitentiary for life.

John Cherris was shot through the head and killed. Jack Jones testified that appellant did the shooting; that it was done on the night of August 30, 1931, in Houston, Texas; and that afterward witness, his brother Keggy Jones and appellant, took the body out near West Columbia, wired weights on it, and dropped it from a bridge into the Brazos river. This was Sunday night. Three days later the body of Cherris with the iron wired to it was found in the Brazos river a short distance below a bridge on whose floor and railing a quantity of blood

444

was noted. There were two bullet holes in the head, one in the back and the other in the top. The money, watch, ring, etc., of deceased were found on his person.

Appellant testified denying his presence at or part in the killing. He said he did not know Cherris, and was not out with the Jones brothers in any car on the night of said homicide. The court below told the jury in his charge that Jack Jones, who was introduced by the state, was an accomplice, and in correct form told them they could not convict on Jones' testimony unless he was sufficiently corroborated. We think ample corroboration appears. Appellant was seen on the night of August 30, 1931, at about midnight with Keggy and Jack Jones on the bridge above referred to, by a man who identified each of the three and said they ran across the bridge in front of his car and to a car standing near. When he first saw them they were about twenty-five feet from where the blood was afterward found on the bridge, and were going toward their car. The car to which the men went was a brown Ford sedan. Jack Jones testified that the car in which the body was driven was a brown Ford sedan, and further he testified that after throwing the body in the river the three men came back through Angleton and there woke up a filling station man at a two-story station and got some gas from him. Davis testified that he ran a two-story-filling station at Angleton, and that about three a. m. on the night of August 30th he was awakened by men in a maroon colored car and sold them gas. One of these men he said was appellant. A laundryman of Houston swore that on August 31st he went to appellant's apartment in said city and was given a suit of clothes by appellant's wife, on which he saw blood, and was asked if he could remove said blood spots.

Jack Jones further testified that after shooting deceased in said car and carrying the body to the Brazos river and dropping it in, the party came back to Houston, and the next day removed the license plates from the murder car, saturated it with gasoline, and burned it up. He further testified that he moved from place to place for several days, and finally, at the home of a Mrs. Martin where he was spending the night, split a mattress and put said license plates in said mattress. Mrs. Martin testified that she found said license plates in the mattress and turned them over to the officers. The number of these plates were shown to be F 55949. Mr. Light testified that about the middle of August, 1931, he sold appellant an old car, and agreed to and did get new license plates and put on same, for which appellant gave him the money. Appellant gave witness the name of M. R. Moore. Light testified that he signed

the transfer to appellant as M. R. Moore in the name of Roosevelt Houston, that being the name of the man from whom witness got said old car. This transfer was introduced in evidence, or the record of same, and showed the license number to be F 55949. Another witness testified that he saw Jack Jones and appellant together a day or two after this killing. The fact of the discovery of the body of deceased was published in the Houston papers. Appellant left Houston about this time and went to a small town in east Texas, where he remained for a few days apparently avoiding observation. He was arrested in Pueblo, Colorado, about the middle of September, 1931. We have not tried to set out all the corroborative circumstances.

Appellant asked a special charge presenting the theory of his right to act in his own self-defense against an attack upon him by deceased. We think said special charge correctly refused. Nothing in the record supports any such theory. Appellant also asked a special charge submitting his right to kill Cherris if it reasonably appeared to him that Cherris was about to kill Keggy Jones; and that if the jury believed from the testimony that appellant shot Cherris to prevent the killing or infliction of serious bodily injury upon Keggy Jones, appellant's act would be lawful, and he should be acquitted. In their able brief appellant counsel admit that the theory of this charge is opposed by appellant's own testimony, in that he swore he was not present at the scene of the killing; but they urge that such theory finds support in the testimony of Jack Jones. See Elam v. State, 16 Texas App., 34; Bishop v. State, 43 Texas, 390; article 666, C. C. P.

Without giving in detail the testimony of the last-named witness, we set up the case on its facts to see whether the testimony referred to supports appellant's theory in the latter regard.

Appellant lived at 407 Lamar street, Houston, Texas. Some time after nine o'clock Sunday night, August 30, 1931, he got a phone call. A car presently drove up. Appellant got in the car and left. According to the testimony of Jones, the party in said car then consisted of appellant, K. and J. Jones. K. Jones was driving the car then and when this killing took place. He had two pistols and J. had one. When appellant got in the car, K. Jones told him that he was going to "make Cherris talk," and wanted appellant to go with him. As they drove along K. Jones, without request from or explanation by appellant, handed the latter a pistol, thus putting a pistol in possession of each of the three. As they went away K. Jones also told J. that

if Cherris looked back he wanted J. to turn his face, as he did not want Cherris to recognize J. At this juncture appellant spoke up and said it would make no difference anyhow as he (Cherris) "wasn't coming back." The party proceeded to a point near St. Joseph's Infirmary in Houston, and about the time they drove up one Buddy Jenkins came with deceased in his car. This indicated prearrangement. Deceased got out of Jenkins' car and got into the Jones car on the front seat, and without statement as to where to go or consultation, K. Jones drove away. The situation of the four men in the car was that K. had the wheel; beside him was deceased, immediately behind whom was appellant, while J. was behind his brother. Before they had gone more than a few hundred yards, appellant shot deceased; the bullet entering the back and coming out at the top of the head. Presently the car was stopped and three pieces of iron, aggregating one hundred pounds in weight, were obtained. The party then drove out of Houston through Angleton in Brazos county to where the highway crossed the Brazos river. Here the body was laid on the railing of the bridge apparently, the iron weights mentioned were wired to it, and the body was dropped in the water, where it was later found. These facts have some bearing on the contention of appellant that he had a right to shoot deceased on the theory that the latter was attempting to shoot K. Jones, or that it so reasonably appeared to appellant at the time.

From J. Jones' testimony we note further that when deceased got into the car Jones had his pistol *in his hand*. He also testified that he had his gun in his hand when appellant shot Cherris. As the car moved away, J. Jones testified that K. Jones made some inquiries as to the family of deceased, which were answered, and K. Jones said to deceased, "What is wrong with your hip?" or "Why have you something on your hip?" He said that then Cherris reached for his gun. Appellant said, "Drop that gun," twice; then fired. J. Jones testified that Cherris' gun went off or was fired after he was shot by appellant. No witness testified that deceased did or said anything other than what we have set out. No one claimed that his pistol was pointed at K. Jones, or that deceased ever got his pistol out, or then made any threatening statement to or movement toward K. Jones. K. Jones was sitting under the wheel when the shooting took place. How he knew, or whether he knew, is conjectural based only on the question above set out put by him to deceased. What the tone of this question or its significance was to the two men in the back seat, where they could easily observe every movement of deceased, is also left unde-

termined. We see nothing in what occurred before or at the time of or subsequent to the killing supporting any theory that deceased was attempting to kill K. Jones. It is shown that appellant's attorney on cross-examination of J. Jones asked and received the answer which appears in the following quotation: "Q. You are here telling this jury that the man that tried to defend your brother's life is the man that fired the shot? A. Yes, sir." The hypothesis contained in the question asked was the suggestion of counsel for appellant, and its affirmative answer by J. Jones can have no force or weight beyond the facts stated by said witness as seen and heard by him at the time, and which constituted his narration of what then took place.

Buddy Jenkins, who brought deceased to the meeting place near the St. Joseph's Infirmary, appears in this record to have been one of a group which met in Dallas ten days before this killing, made up of men referred to as bad men, and men with records. Appellant was present at this meeting. K. Jones seems to have been there. He appears to have been suspected of some sort of treachery. Some character of threats seem to have been indulged in there, none of them, however, attributable to Cherris.

Some one had Buddy Jenkins to bring deceased to meet the three men who "took him for a ride." They were going to "make him talk." He "wasn't coming back," in the language of appellant before deceased got in their car. His seat in the car was apparently arranged for him before he got in. He was so seated as to be immediately in front of the man who knew beforehand that he wasn't coming back. The ride had scarce begun when the life of deceased was snuffed out by the same man. The significance of the words of K. Jones, "What is wrong with your hip?" apparently sprung the trap. Whether deceased then for the first time sensed his danger and attempted to defend or protect his life, we can only conjecture; but it is made certain that when he moved in that direction the watchful eye of appellant caught the move, and the command to drop the gun was re-enforced by the crack of appellant's pistol in deadly nearness. "He wasn't coming back," but the mills of the Gods that grind slow, but grind exceeding fine, began their grinding.

Jack Jones was a state witness. Complaint on behalf of appellant that Jack was asked by the state's attorney on redirect examination, if he had ever been engaged in any holdup or bank robbery or burglary before he met appellant, and that this was hurtful to appellant even though his objection to same was sustained, seems untenable. The bill presenting the complaint is qualified to show that the only objection in fact made to this

448

question was that it was immaterial and irrelevant. We are unable to see the application of the authorities cited by appellant.

Complaint of the admission of testimony to which no objection was made, is of no avail; and this is true of what is said against an argument made by the state's attorney which is not so brought before us as that we can appraise the objection made. Bills of exception 1 and 2 bring forward appellant's complaint of the refusal of the special charges presenting the theory of self-defense above discussed. We might observe that the affirmative defensive theory raised by appellant was that of alibi, upon which the court fully charged.

The alleged newly discovered testimony was that of a witness who attended the trial and was apparently not used by either side, showing that such testimony could not be held newly discovered. The numerous authorities cited by appellant, in his brief, in support of the views of his attorneys on the question of the propriety of refusing the special charges on self-defense, do not seem to us to in any wise hold contrary to what we have said.

Finding no error in the record, the judgment will be affirmed

*Affirmed.*